# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-11167

United States Court of Appeals
Fifth Circuit

**FILED**

February 6, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

NICHOLAS ALBARADO,

Defendant – Appellant

Cons w/ No. 13–10107

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

JOSHUA CISNEROS,

Defendant – Appellant

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 1:11-CR-58

No. 12-11167
c/w No. 13-10107

Before KING, CLEMENT, and GRAVES, Circuit Judges.

PER CURIAM:[*]

Nicholas Albarado and Joshua Cisneros appeal from the denial of their motions to suppress evidence seized from a residence. For the reasons that follow, we AFFIRM.

## I.    Factual and Procedural Background

Nicholas Albarado and Joshua Cisneros were indicted on multiple counts including conspiracy to distribute methamphetamine, possession with intent to distribute methamphetamine, possession with intent to distribute cocaine, possession with intent to distribute marijuana, and possession of a firearm in furtherance of a drug trafficking crime. Before trial, they moved to suppress the drug and gun evidence seized from a residence in Abilene, Texas. They argued that, following an initial "knock and talk," law enforcement agents had entered the residence without a warrant, without probable cause, and in the absence of any exigent circumstances.

A hearing was held on the defendants' suppression motions. Ismael Jaimes, an agent with the Abilene Police Department, Special Operations Division, testified at the hearing. He testified that, on the morning of August 30, 2011, he and his partner planned to approach the subject residence to conduct a "knock and talk" investigation. This was based on a tip that another agent had received from a confidential informant, who claimed that the residence was a marijuana stash house for the "Mexican Mafia" organization. Agent Jaimes stated that he had been unaware of this residence or its occupants prior to receiving the tip. However, he testified that he knew that

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the Mexican Mafia was a dangerous organization, that its members were involved in drug- and firearms-related crimes, and that its members and other narcotics traffickers often possessed firearms near any drugs.

The agents arrived at the residence in an unmarked car, wearing plain clothes, and with police badges visible around their necks. Albarado answered their knock. Agent Jaimes testified that he immediately noticed a "strong odor" of burning and fresh marijuana coming from inside the residence. He also testified that he immediately recognized Albarado from prior drug investigations and that he knew from another confidential informant that Albarado was involved with the Mexican Mafia and the sale of illegal drugs.

Agent Jaimes showed Albarado his badge and identified himself and his partner as police officers. When asked if he lived at the residence, Albarado answered no. Agent Jaimes then asked if the agents could come inside and speak with Albarado, but Albarado replied that he could not give them permission to enter because he was not the owner of the residence. The agents then asked to speak with the owner. Albarado replied that he would have to retrieve her from the back of the residence.

Albarado turned away and tried to close the door. The agents stopped the door from closing and entered the residence. Agent Jaimes testified that they entered to prevent the destruction of evidence and for safety reasons. On cross-examination, Agent Jaimes acknowledged that Albarado did not appear to be a threat at that time and made no attempt to flee.

Once inside, the agents followed Albarado to the door of a bedroom, where he called out to a woman lying on the floor, who was later identified as Ana Mar Landini. When Landini stood up, the agents identified themselves and showed her their badges. Agent Jaimes told Landini why they were at the residence, said that he could smell marijuana, and asked if there was more

marijuana in the house. Landini replied that the residents had smoked marijuana the previous evening and that there was "a little bit" left over. She surrendered a partially smoked marijuana cigarette. Agent Jaimes said he did not believe Landini's explanation due to the strong odor of "fresh" marijuana in the residence. When asked if anyone else was inside, Landini roused Joshua Cisneros off the bedroom floor. The agents then escorted everyone back into the living room.

Agent Jaimes explained why the agents were at the residence, read everyone their rights, and asked for consent to search the residence for more marijuana. Albarado and Cisneros said they could not give consent since they did not live there, and Landini said she could not give consent because her roommate was not present. Agent Jaimes then called for another agent to come to the residence to assist while he left to prepare a search warrant application. The residents were not handcuffed, and they were allowed to play video games while they waited.

After the warrant was obtained and executed, the agents found approximately 324.6 grams of methamphetamine, 52 grams of cocaine, 678 grams of marijuana, three firearms, scales, a cutting agent, and more than $5,700 in cash. Agent Jaimes denied conducting any search of the residence prior to obtaining the warrant.

Based on this testimony, and the parties' arguments, the district court denied the motions to suppress. The district court found that the entry was justified by safety concerns and that the agents conducted a limited protective sweep of the residence. Albarado then pleaded guilty to one count of possession with intent to distribute 50 grams or more of methamphetamine and one count of possession of a firearm in furtherance of a drug trafficking crime. Cisneros proceeded to a bench trial and was found guilty on all counts. Each defendant

was sentenced to a total of 216 months' imprisonment. The defendants timely appealed the denial of the suppression motions, and their appeals were consolidated.

## II.    Standard of Review

"[W]here a police officer acts without a warrant, the [G]overnment bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005). The district court's findings on a motion to suppress are reviewed for clear error, and its ultimate conclusion as to whether the Fourth Amendment was violated is reviewed de novo. *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010).

## III.    Discussion

On appeal, the defendants raise several challenges to the justifications for, and scope of, the agents' protective sweep of the residence. We note initially, however, that the defendants do not challenge the officers' use of a "knock and talk" strategy, which we have recognized as a valid investigatory technique, not requiring a warrant, when law enforcement officials seek to gain consent to search or reasonably suspect criminal activity. *See United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001).

The defendants' first argument is that, after conducting the "knock and talk," the agents lacked probable cause to enter the residence. *See id.* at 719 n.2 ("In order to vindicate a warrantless search by proving exigent circumstances, the government must also show probable cause."). Before they knocked, the agents had received a tip that the residence was a marijuana stash house for the Mexican Mafia. Once Albarado opened the door, the agents could smell the odor of burned and fresh marijuana. *See United States v. Pierre*, 958 F.2d 1304, 1310 (5th Cir. 1992) (en banc) (finding that the smell of marijuana can give rise to probable cause). The agents also recognized

Albarado from past drug investigations, and knew of a separate tip that Albarado was involved with the Mexican Mafia. We find that once the agents spoke with Albarado, they had probable cause to believe a crime was being committed.

The defendants' second argument is that there were no exigent circumstances justifying the agents' warrantless entry into the residence. "As a general rule, exigent circumstances exist when there is a genuine risk that officers or innocent bystanders will be endangered, that suspects will escape, or that evidence will be destroyed if entry is delayed until a warrant can be obtained." *United States v. Menchaca-Castruita*, 587 F.3d 283, 289 (5th Cir. 2009). A reviewing court must consider the circumstances objectively as they would appear to a reasonable and prudent person. *United States v. Troop*, 514 F.3d 405, 409 (5th Cir. 2008). However, when reasonable minds may disagree, a court should "not second guess the judgement of experienced law enforcement officers concerning the risks of a particular situation." *Menchaca-Castruita*, 587 F.3d at 290 (internal quotation marks and citation omitted). A district court's determination that exigent circumstances existed is a factual finding that this court reviews for clear error. *Troop*, 514 F.3d at 409.

We agree with the district court that the warrantless entry was justified by the agents' reasonable concern for their safety. As previously noted, when the agents approached the residence, they already had a tip that the residence was associated with the Mexican Mafia, which they knew to be a violent drug trafficking organization. When the door opened, one agent immediately recognized Albarado from past drug investigations, knew that Albarado had been linked to the Mexican Mafia by another tip, and smelled marijuana inside the house. The agents also knew from their training and experience that drug traffickers often keep firearms near their drugs.

Additionally, permitting the door to close would have given Albarado the opportunity to alert the residence's other occupants to the agents' presence and would have afforded the occupants the opportunity to arm themselves. Albarado told the agents that there was at least one other person somewhere inside the house, whom the agents could not see. If, after the "knock and talk," the agents had waited at the front of the house for Albarado to return, they would have been vulnerable to an attack. In light of these facts, the district court did not clearly err in determining that exigent circumstances existed based on the agents' objectively reasonable belief that they were in danger from an unknown and likely armed person somewhere inside the residence. *See United States v. Maldonado*, 472 F.3d 388, 393–94 (5th Cir. 2006) (holding that there was a reasonable concern for safety justifying a protective sweep of a trailer where agents were in a vulnerable location), *abrogated in part on other grounds by Kentucky v. King*, 131 S. Ct. 1849 (2011).

In addition, although not relied on by the district court as justification for the warrantless entry, an agent also testified that the entry was based on a belief that the residents might try to destroy any evidence. *See Sojourner T v. Edwards*, 974 F.2d 27, 30 (5th Cir. 1992) (stating this court may affirm on any basis supported by the record). Albarado was aware of the presence of law enforcement. If allowed to reenter the house unaccompanied, he could inform anyone else inside. The agents knew from their training and experience that drug traffickers will try to destroy evidence when confronted by police. We conclude that the agents had an objectively reasonable belief that the residents would try to destroy any evidence while the agents tried to obtain a search warrant. *See United States v. Webster*, 750 F.2d 307, 326–27 (5th Cir. 1984).

The defendants' third argument is that the agents failed to conduct a proper protective sweep of the residence. The protective sweep doctrine allows

No. 12-11167
c/w No. 13-10107

government agents, without a warrant, to conduct a quick and limited search of premises for the safety of the agents and others present at the scene. *See United States v. Gould*, 364 F.3d 578, 581 (5th Cir. 2004) (en banc), *abrogated in part on other grounds by King*, 131 S. Ct. 1849. As discussed above, the initial entry into the residence was justified by exigent circumstances. Based on Albarado's statement that someone else was present and the known connections between Albarado, the residence, and the Mexican Mafia, the agents had a reasonable suspicion that another person, most likely in possession of a firearm, was inside. In light of these concerns, the "sweep" in this case was not overly broad or long. It consisted of following Albarado to a bedroom, watching him wake two other persons, and then escorting everyone to the living room. The individuals in the residence were not handcuffed, and they were allowed to play video games while they waited. Once the residence was secured, the agents sought and received a search warrant, and conducted a more thorough search. We conclude that the protective sweep was proper. *See id.* at 587.

Finally, the defendants argue that the agents' decision to knock on the door of the residence created any exigent circumstances. This argument is foreclosed by the Supreme Court's decision in *Kentucky v. King*, 131 S. Ct. 1849. In that case, the Supreme Court held that a warrantless entry to prevent the destruction of evidence is permissible as an exigent circumstance as long as the officers acted reasonably and did not create the exigency through any actual or threatened Fourth Amendment violations. *Id.* at 1858. In doing so, the Court rejected a rule that police may not rely on an exigency for a warrantless search if it was "reasonably foreseeable" that their legally permissible tactics would create the exigent circumstances. *Id.* at 1859–60. In this case, the agents' "knock and talk" investigation was a legally valid

8

investigatory tactic. Albarado voluntarily opened the door, revealing himself to the agents and allowing them to smell the marijuana inside. He then chose to answer the agents' questions, alerting them to the presence of another unknown person inside the house. The actions of the agents were permissible and did not create any exigent circumstances. *See id.* at 1858.

## IV.  Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of the defendants' motions to suppress.